**TRUCK DRIVERS, CHAUFFEURS & HELPERS LOCAL UNION NO. 100, Plaintiff,**

v.

**QUICK–FREEZE COLD STORAGE, INC. d/b/a Serv-All Foods, Inc.,**

and

**Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local No. 7, Defendants.**

Misc. No. 72–9.

United States District Court, S. D. Ohio, W. D.

April 18, 1974.

Jonas B. Katz, Cincinnati, Ohio, for plaintiff.

Thorley C. Mills, Jr., Taft, Stettinius &· Hollister, Wm. C. Hirsch, Cincinnati, Ohio, for defendants.

## ORDER ON PENDING MOTIONS

HOGAN, District Judge.

On March 19, 1973 the Court ordered the parties to this action to proceed to tripartite arbitration on the

"(a) issue between plaintiff and Quick-Freeze [d. b. a. Serv-All Foods] under their contract,

and

(b) the issues as agreed on in the stipulation between Quick-Freeze and Meatcutters, arising under their contract."

The first issue referred to involved the grievance filed by a member of plaintiff Truck Drivers, Chauffeurs and Helpers Local Union No. 100 (Teamsters). The grievance stated:

"The following work is presently being performed by members of Meat Cutters Local Union No. 7: Dock work, loading and unloading of trucks, driving and parking, washing and gassing of trucks, and the work of mechanics helper. It is our contention that under the terms of our current contract that this work should be done by members of Local No. 100. MY CLAIM IS FOR: To have all of the above-cited work assigned to members of Local No. 100 pursuant to the current contract."

With respect to the second matter submitted to arbitration, the stipulation between defendants Serv-All and Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, Local No. 7 (Meat Cutters) provided that the issues to be arbitrated were as follows:

"a. Under the current collective bargaining agreements between Meat Cutters and Serv-All and Teamsters Local 100 and Serv-All, is the work of dock work; loading and unloading trucks; driving and parking; wash-

ing and gassing of trucks; and the work of mechanics helper, properly assigned to meat handlers represented by Meat Cutters Local 7?

"b. In view of the conflicting claims now asserted by Teamsters Local 100 to the aforesaid work, which has been historically and is presently assigned to and being performed by meat handlers represented by Meat Cutters Local 7, to what extent is the determination of whether work is properly assigned to meat handlers governed by application of federal law, and what federal law principles apply?"

On October 24, 1973, a majority of the Board of Arbitration chosen in accordance with Article 16 of the Teamster contract issued an opinion and award. The case is now before the Court on the cross-motions of the parties. Defendant Serv-All moves to dismiss· the suit on the ground that the arbitration award is final and binding. Plaintiff Teamsters moves to vacate the arbitration award for the reasons that the arbitration board exceeded its authority and that members of the panel were guilty of misbehavior.

 In essence, both motions involve the conclusiveness of the arbitration award. The law is well established that if an arbitration award is final and binding on the parties under the terms of the collective bargaining agreement, the finality of such an award should not be disturbed by the courts. United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). There is, however, a recognized exception to this general rule:

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts

have no choice but to refuse enforcement of the award." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596–597, 80 S.Ct. 1343, 1361, 4 L.Ed.2d 1403 (1960).

Turning to the opinion and award issued by a majority of the Board of Arbitration [1] the Court notes that the majority identified four areas of work dispute between the three parties: (1) unloading, (2) gassing and washing Serv-All trucks, (3) loading of out-of-town Serv-All trucks, and (4) loading of Serv-All in-town trucks. To resolve the four work-assignment disputes, the Board first delineated the applicable legal principles. The majority noted that "Unlike many collective bargaining agreements, Article 16 of said contract [between Serv-All and Teamsters] does not limit grievances to questions of interpretation, application or alleged violations of the terms of the contract." (Opinion and Award at 6–7.) Nor did the contract "restrict the Board of Arbitration from considering factors outside of the contract and does not even prevent the Board of Arbitration from modifying, adding to or subtracting from the contract." *Id.* at 7. The Board also found the contract between Serv-All and Meat Cutters similarly unrestrictive. Nevertheless, the majority decided that it was unnecessary "to modify, add to or subtract from the terms of either contract in resolving the dispute between the parties." *Id.*

After examining the language of both collective bargaining agreements, the majority stated that they were

"unable to rely solely and exclusively upon the terms and conditions of either Union's contract in resolving this dispute. First, the language of both contracts is ambiguous, when considered both separately and together, in light of the parties' past practice, the prevailing practice in the industry and the bargaining history. The evidence clearly demonstrates that despite the contract language claimed by both Unions to be dispositive of the issues involved, both Unions have accepted in many instances, for at least eight if not ten years, a very flexible assignment of loading and related work by the Company, not in full accord with the positions they now advance under their respective contracts. It is inconceivable that officials and Union Stewards from both Unions did not have full knowledge of this fact. However, the Company's work assignment practices continued despite numerous opportunities afforded both Unions to change them at contract termination time through collective bargaining. . . . [Therefore,] the Board cannot limit itself to a strict construction of either contract or both contracts in resolving the dispute." *Id.* at 8–9.

Since the Board found the contract provisions ambiguous and since the Board's authority was not strictly limited by the contracts, the majority felt obliged to "apply the paramount principles of well-established federal law in the area of jurisdictional disputes." *Id.* at 7. Accordingly, the Board considered "such factors as the particular skills and work involved, . . . Company and industry past practices, bargaining history, agreements between unions and employers and between unions, awards of other arbitrators, the work assignments made by the employer and the employer's desires in regard thereto, and the efficient and economical operation of the business." *Id.* at 8.

Having set forth the applicable legal principles, the Board then resolved the four work areas in dispute. First, the work of unloading was assigned to the Meat Cutters. In reaching this decision, the Board found that this work had been done by the Meat Cutters since the inception of the business and almost exclu-

---

1. The Board consisted of three members: Robert J. Townsend, the Company member; Joseph Carlotta, the Teamsters member; and the Honorable William R. Matthews served as Chairman and as the neutral member.

sively by them since at least 1965. Despite four contract negotiations, the Teamsters had not changed this practice. The Board further concluded that Serv-All could not efficiently assign the unloading work to members of the Teamsters. The majority considered this work "highly integrated with the other work of the meat handlers [who are members of the Meat Cutters] within the plant."

According to the Board's opinion, the members of the Meat Cutters engaged in unloading spent more than 51% of their day working inside the plant. This percentage was significant since the Board took cognizance of a "51% rule" existing in the industry and between these parties. Under this rule, if an employee spends at least 51% of his time in the meat plant, he is required to be a member of the Meat Cutters. Conversely, if he spends at least 51% of his time outside of the plant, he is to be a member of the Teamsters. The purpose of the rule, according to the Board, is to avoid work disputes and to promote efficiency and economy in the industry by providing members of each Union with a full day's work. Because of this practice the Board considered it an implied term of the contract and therefore helpful in resolving the ambiguity of the contract.

Second, gassing and washing trucks was assigned to the Teamsters. The facts indicated that the employee engaged in this work, though a member of the Meat Cutters, spent almost all of his time in work outside of the plant. The Board concluded that this work could be assigned to the Teamsters without unduly restricting the efficient operation of the business. Apparently, the only reason this employee had not been placed in the Teamsters was in order to protect his seniority and pension rights under the Meat Cutters' contract.

Third, the work of unloading out-of-town trucks was assigned to the Meat Cutters, with the provision that the Teamsters might assist in this work in accordance with past practice. Again, the Board applied the same criteria to resolve this dispute—past practice, the 51% rule, bargaining history, and the economic impact of the award. Using these criteria, the fourth work dispute, the loading of in-town trucks, was awarded to the Teamsters, with the provision that the Meat Cutters might assist in this work in accordance with past practice.

The Court deals first with the Teamsters' contention that the arbitration board exceeded its authority.[2] Teamsters advance two lines of reasoning. The first is that the language of the Teamster contract is so explicit with respect to work jurisdiction as to preclude the arbitrators from considering other factors not contained in the contract. The second argument is that the Board could consider other relevant factors to some extent, but in this instance the majority excluded consideration of the terms of either the Teamster or Meat Cutter contract.

The pertinent provisions of the Teamster contract read as follows:

"Section 1. This agreement shall cover all truck drivers and truck drivers' helpers, checkers, dockmen, car washers, tire men, gas men, greasers and mechanics employed by the Employer, directly, indirectly, or in any wholly owned or controlled subsidiary company of the Employer, who are regularly engaged in driving trucks, assisting in the operation of a truck, loading or unloading trucks, checking or routing merchandise or performing such services on similar other vehicles.

\* \* \* \* \* \*

"Section 5. All work within the jurisdiction of the Union members employed by the Company, which is performed by Company employees, shall only be performed by Union members."

---

2. Plaintiff's motion to vacate is apparently not directed at the entire arbitration award, since two of the work assignments were decided in favor of the Teamsters. However, all four work assignments were based on the same criteria.

The material part of the Meat Cutters' simply provides that:

"The Employer agrees to recognize the Amalgamated Meat Cutters and Butcher Workmen of N.A., Local No. 7 as the exclusive bargaining agent for all employees of the company over whom the Union has organization jurisdiction. . . ."

Although the opinion of the Board does not focus specifically on the problematic language of the contracts, defendant Serv-All indicates that the ambiguity was primarily contained in the provision of the Teamster contract which gives that Union jurisdiction over employees "regularly engaged" in certain work functions. The ambiguity in the phrase "regularly engaged" was particularly evident "in light of the parties' past practice, the prevailing practice in the industry and the bargaining history." (Opinion and Award at 8–9.) With respect to the Meat Cutter contract, it simply asserts coverage over all employees over "whom the Union has organization jurisdiction".

This Court agrees that, arguably, ambiguity exists in the contractual language. In order to determine the intent of the parties, other relevant factors had to be considered. Whether this Court agrees with the Board's construction of the contracts is irrelevant. Kroger v. Teamsters Local 661, 380 F.2d 728, 731 (6th Cir. 1967). The Court is not persuaded by plaintiff's argument that the contracts are so plain and unambiguous as to prohibit collateral evidence of intent or that the Board failed to consider the terms of the contracts. On the contrary, the Court finds that the Board was justifiably forced to resolve the ambiguity, whether latent or patent, by looking to other relevant evidence. Other courts have also approved the arbitrator's use of collateral evidence, such as past practices and bargaining history, to interpret an otherwise unclear contract. Humble Oil & Refining Co. v. Local 866, 447 F.2d 229 (2nd Cir. 1971); Holly Sugar Corp. v. Distillery, Rectifying, Wine & A. W. I. U., 412 F.2d 899 (9th Cir. 1969); Textile Workers Union v. Textile Paper Products, Inc., 405 F.2d 397 (5th Cir. 1968).

There still remains, however, the allegation by plaintiff Teamsters that the decision of the majority was the result of "misbehavior" and thus violative of the Arbitration Act, 9 U.S.C. § 10(c). This allegation is supported by the affidavit of Joseph Carlotta, the Teamster member of the arbitration panel who refused to sign the majority's decision. The affidavit states that on October 10, 1973 the Chairman of the Board of Arbitration, the Honorable William R. Matthews, indicated that he had decided that the work of loading out-of-town trucks was properly within the jurisdiction of the Teamsters. In reply to this, according to Carlotta, the company member, Robert Townsend, stated that the company "could not live" with such an award. Thereupon, the affidavit alleges, the chairman reversed his decision and stated that if that were the case, he would allow the company to assign the work to the Meat Cutters.

In response to this charge of misbehavior, defendant Serv-All has submitted the affidavit of Robert Townsend. Townsend states that on October 10, 1973 during the deliberations of the panel, Chairman Matthews indicated that he was inclined to award the unloading work to the Teamsters. Townsend alleges that he pointed out that such an award "would be uneconomical and inefficient and contrary to the applicable principles which the Board should apply in the resolution of the issues." It was further pointed out, according to Townsend, that an award of the unloading work to the Meat Cutters would have little adverse economic effect on the Teamsters, since their contract and that of the Meat Cutters would expire in January, 1974, affording each side an opportunity to maintain or alter past practice through contract negotiations.

The Court first notes that the consideration of the economic impact of a particular award was listed in the opinion as one of the criteria used to resolve the work dispute. The opinion states that the Board would consider, *inter alia*, "the efficient and economical operation of the business." Hence, the fact such a colloquy took place between the panel members is not surprising. In fact, it confirms that such facts were weighed before a final decision was rendered.

 Plaintiff contends that it was improper to consider the economic consequences of an award. The Court does not agree. With respect to the arbitration procedure as an alternative to the judicial process, the Supreme Court has stated:

> "The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, *such factors as the effect upon productivity of a particular result*. . . . The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." United Steelworkers v. Warrier & Gulf Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). (Emphasis added.)

To prohibit the consideration of economic factors in this instance, where the agreement does not restrict the authority of the arbitrators, would unduly interfere with the purpose of arbitration. "For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs." 363 U.S. at 582.

Moreover, the opinion of the majority of the Board indicates that other facts, including past practice, the 51% rule, and bargaining history, were also examined in order to resolve the opaque language of the contracts. For these reasons, the Court concludes that the arbitration award in this instance "draws its essence from the collective bargaining agreement." Therefore, defendant's motion to dismiss is hereby granted and plaintiff's motion to vacate is denied.